## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOHN SOLAK, Individually And On Behalf Of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>W. ALEXANDER HOLMES, LARRY ANGELILLI, PAMELA H. PATSLEY, J. COLEY CLARK, VICTOR W. DAHIR, ANTONIO O. GARZA, SETH W. LAWRY, PEGGY VAUGHAN, MICHAEL P. RAFFERTY, GANESH RAO, W. BRUCE TURNER, MONEYGRAM INTERNATIONAL, INC., ALIPAY (UK) LIMITED, ALIPAY (HONG KONG) LIMITED, MATRIX ACQUISITION CORP., and ANT FINANCIAL SERVICES GROUP,<br><br>Defendants. | Case No.<br><br>Judge<br><br><br>**CLASS ACTION**<br><br>**SHAREHOLDER CLASS ACTION COMPLAINT BASED UPON VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY DEMAND** |

John Solak ("Plaintiff"), by and through his attorneys, alleges upon information and belief, except for his personal actions, which is alleged upon personal knowledge, as follows:

### SUMMARY OF THE ACTION

1.      This is a stockholder class action brought by Plaintiff on behalf of holders of the common stock of MoneyGram International, Inc., ("MoneyGram" or the "Company") against the Company, its board of directors (the "Board"), certain members of its senior management team, Ant Financial (defined below) and the Ant Affiliates (defined below) for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and the rules and regulation promulgated thereunder, including Rule 14a-9, in connection with the

proposed acquisition of MoneyGram by Alipay (UK) Limited ("Alipay UK") through a merger transaction with its newly formed subsidiary Matrix Acquisition Corp. ("Merger Sub"), as detailed herein (the "Proposed Transaction").

2.      On January 26, 2017, MoneyGram and Ant Financial Services Group ("Ant Financial") announced that they entered into a definitive agreement (the "Merger Agreement") pursuant to which MoneyGram would be acquired by Ant Financial with stockholders of MoneyGram being offered $13.25 per share in cash for their shares.  Under the terms of the Proposed Transaction, Alipay UK, an entity owned by Alipay (Hong Kong) Limited ("Guarantor") – a subsidiary of Ant Financial, will acquire all outstanding shares of MoneyGram.  The Proposed Transaction was unanimously approved and adopted by the members of the MoneyGram Board of Directors (defined below).  The $13.25 per share consideration represents a mere 11.5% premium to the closing price of the Company's shares on the day prior to the announcement.

3.      Significant stockholders – Thomas H. Lee Partners, L.P., along with its affiliates and co-investors ("THL") – and Company insiders have agreed to vote an aggregated, approximate 46% of the Company's common stock in favor of the Proposed Transaction through entry into voting and support agreements (the "Voting and Support Agreements").  Further, Goldman, Sachs & Co., Inc., ("Goldman Sachs") holder of 100% of the Company's non-voting Series D Preferred Stock delivered an irrevocable written consent to Alipay UK in connection with the Proposed Transaction.  If the Proposed Transaction is consummated, THL would receive over $314 million and Goldman Sachs stands to receive over $118 million. Both THL and Goldman Sachs provide substantial revenue to the target's financial advisor Merrill Lynch,

Pierce, Fenner & Smith Inc. ("BofA Merrill Lynch"), which also was serving as a strategic advisor to a potential acquirer concerning at least one mutually exclusive transaction.

4.     Although the total value of the Proposed Transaction is reportedly $880 million, the total value to non-insiders is just $325 million.  This consideration is wholly inadequate to the Company's public shareholders, who are being deprived of their share of MoneyGram's bright future.

5.     After years of suffering through a downturn following the financial crisis, including a very costly recapitalization, the Company remained substantially undervalued in the market, even though it is poised for much future success.  Given its current state, Ant Financial – and the Ant Affiliates (defined below) - will acquire MoneyGram at a price that does not accurately reflect the inherent, standalone value of the Company.   Indeed, the Company has made significant progress in the last fiscal year following investments in growth initiatives and in the most recent quarter, the Company's stock soared due to positive earnings results.  MoneyGram has been experiencing improved cash flow trends resulting in adjusted free cash flow of $83.6 million through the first three quarters well above its initial 2016 guidance for adjusted free cash flow of approximately $50 million and $103.6 million from the prior year period.

6.     The Company also is emerging from years of regulatory and criminal issues.  In November 2012, the Company announced a settlement was reached with the U.S. DOJ relating to a previously disclosed investigation of transactions involving certain of the Company's U.S. and Canadian agents, as well as fraud complaint data and the consumer anti-fraud program, during the period from 2003 to early 2009. In connection with this settlement, the Company entered into a deferred prosecution agreement ("DPA") with the U.S. DOJ, dated November 8,

2012. Under the DPA, the Company forfeited $100 million, which became available as restitution to victims of the consumer fraud scams perpetrated through MoneyGram agents. The DPA required that the Company retain an independent compliance monitor for a period of five years, subject to adjustment to a shorter period under certain circumstances. Upon information and belief, the monitor's term ends in or about November 2017. Accordingly, the Company will no longer incur the costs and burdens associated with the monitor's oversight, the benefits of which will inure to Ant Financial and Ant Affiliates going forward.

7.      Under the terms of the Merger Agreement, the Defendants (defined below) have further tilted the playing field in favor of Ant Financial and the Ant Affiliates by agreeing to and including a slate of onerous deal protection provisions in the Merger Agreement that will unreasonably deter third party bidders from launching topping bids and effectively cap the consideration that MoneyGram shareholders could receive. These deal protection measures include: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or even in continuing discussions and negotiations with potential acquirers; (ii) an information rights provision that requires the Company to disclose confidential information about competing bids to Alipay UK, and thereby Ant Financial, promptly, or within two business days; (iii) a "matching rights" provision that provides Alipay UK, and thereby Ant Financial, four (4) business days to match any competing proposal that might arise; (iv) outside the context of a competing, superior proposal, a "change of recommendation" provision that requires the Board to negotiate in good faith four (4) business days if the Board determines that failure to take such action would inconsistent with their fiduciary duties to stockholders under applicable law; (v) a prohibitively large termination fee of $30 million to be paid by MoneyGram in the event it chooses to pursue an alternative, superior offer; and (vi) a "no-waiver" provision

that requires the Board to enforce confidentiality and standstill agreements.  The Company has further locked up the deal by entering into Voting and Support Agreements pledging to vote 46% of the outstanding shares in support of the Proposed Transaction.

8.      Standing alone, each of these deal protection devices is sufficient to deter a potential superior bidder.  However, when considered together, these deal protection provisions make it extraordinarily difficult for the Board to consider, investigate and pursue any superior or alternative proposals and render the Proposed Transaction as a *fait accompli*.

9.      In pursuing the plan to facilitate the acquisition of MoneyGram by Ant Financial and the Ant Affiliates for grossly inadequate consideration through a flawed process, the Defendants have violated Sections 14(a) and 20(a) of the Exchange Act by causing a materially incomplete and misleading Schedule 14A Proxy Statement ("Proxy") to be filed with U.S. Securities and Exchange Commission ("SEC") on March 2, 2017.  The Proxy recommends that MoneyGram stockholders vote in favor of the Proposed Transaction based on misleading information and without disclosing all material information.

10.     Most importantly, the management projections underlying the fairness opinion of BofA Merrill Lynch, MoneyGram's financial advisor for the Proposed Transaction, are missing vital information, without which stockholders are unable to accurately judge whether the Proposed Transaction is in their best interests.  In addition, the Proxy also contains materially incomplete and misleading information concerning the background of the Proposed Transaction and the financial analyses conducted by BofA Merrill Lynch.

11.     In short, for these reason and those set forth herein, the Proposed Transaction is designed to unlawfully divest MoneyGram's public stockholders of the Company's valuable assets following a flawed, tilted sales process, in exchange for wholly inadequate consideration

that does not accurately reflect the Company's standalone, inherent value, and without fully disclosing all material information concerning the transaction to the Company's shareholders. To remedy Defendants' Exchange Act violations, Plaintiff seeks injunctive relief preventing the consummation of the Proposed Transaction unless and until the material information discussed below is disclosed to MoneyGram stockholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of the Exchange Act.

## THE PARTIES

12.     Plaintiff John Solak is, and has been at all relevant times, the owner of shares of common stock of MoneyGram.

13.     Defendant MoneyGram is a corporation organized and existing under the laws of the State of Delaware.   The Company maintains its principal executive offices at 2828 N. Harwood St., 15th Floor, Dallas, Texas, 75201.   MoneyGram common stock trades on the NASDAQ under the ticker symbol "MGI."   According to public filings, the Company is a global provider of innovative money transfer services and offers products and services through its two reporting segments: Global Funds Transfer and Financial Paper Products.

14.     Defendant W. Alexander Holmes ("Holmes") is the current Chief Executive Officer ("CEO") of MoneyGram and has served in that capacity since January 2016.   Mr. Holmes previously served as MoneyGram's Executive Vice President, Chief Financial Officer and Chief Operating Officer.   He joined the Company in 2009 as senior vice president for Corporate Strategy and Investor Relations.   Mr. Holmes also serves as a director on the Company's Board of Directors.

15.     Defendant Larry Angelilli ("Angelilli") is the current Chief Financial Officer ("CFO") of MoneyGram and has served in that capacity since January 2016.  Mr. Angelilli first joined MoneyGram in August 2011 in the capacity of Senior Vice President, Treasurer.

16.     Defendant Pamela H. Patsley ("Patsley") is the current executive Chairman of the MoneyGram Board of Directors.  Prior to becoming Chairman, Ms. Patsley served as chairman and CEO before taking the role of executive chairman in 2016.

17.     Defendant J. Coley Clark ("Clark") has served as a director of MoneyGram since May 2010.  Mr. Clark also serves as the Chair of the Human Resources & Nominating Committee.

18.     Defendant Victor W. Dahir ("Dahir") has served as a director of MoneyGram since May 2010.  Mr. Dahir also serves as the Chair of the Audit Committee.

19.     Defendant Antonio O. Garza ("Garza") has served as a director of MoneyGram since April 2012.  Mr. Garza is the Chair of the Compliance and Ethics Committee and a member of the Human Resources & Nominating Committee.

20.     Defendant Seth W. Lawry ("Lawry") has served as a director of MoneyGram since 2008.  Mr. Lawry also serves as a member of both the Human Resources & Nominating Committee and the Compliance and Ethics Committee.  Mr. Lawry serves as one of the two THL appointed representatives on the Board of Directors.

21.     Defendant Peggy Vaughan ("Vaughan") has served as a director of MoneyGram since February 2014.  Ms. Vaughan also serves a member of the Audit Committee.

22.     Defendant Michael P. Rafferty ("Rafferty") has served as a director of MoneyGram since March 2016.  Mr. Rafferty also serves as a member of the Audit Committee.

23.     Defendant Ganesh Rao ("Rao") has served as a director of MoneyGram since November 2008 and is also a member of the Compliance and Ethics Committee.  Mr. Rao is also a managing director of THL and is one of the two THL appointed representatives on the Board of Directors.

24.     Defendant W. Bruce Turner ("Turner") has served as a director of MoneyGram since May 2010.  Mr. Turner is also a member of both the Audit Committee and the Compliance and Ethics Committee.

25.     Defendants Holmes, Patsley, Clark, Dahir, Garza, Lawry, Rafferty, Vaughan, Rao and Turner are collectively referred to herein as the "Board."  The Board and Defendant Angelilli are collectively referred to herein as the Individual Defendants.

26.     Defendant Alipay (UK) Limited is a United Kingdom limited company and is acquiring MoneyGram through a merger with its wholly owned subsidiary Matrix Acquisition Corp.  Alipay UK's sole stockholder is the Guarantor Alipay (Hong Kong) Limited and is a subsidiary of Ant Financial Small and Micro Services Group Co., Ltd.

27.     Defendant Alipay (Hong Kong) Limited is a limited liability company incorporated in Hong Kong and a subsidiary of Ant Financial.  Alipay (Hong Kong) Limited is identified as and described herein as the Guarantor.  According to the terms of the Merger Agreement, among other things, the Guarantor has agreed to make available the proceeds of debt financing necessary to pay the aggregate merger consideration to Alipay UK and Merger Sub.

28.     Defendant Matrix Acquisition Corp. is a Delaware Corporation and was formed solely for the purpose of entering into the Merger Agreement, consummating the transactions contemplated by the Merger Agreement and has not engaged in any business except for activities incidental to its formation and as contemplated by the merger agreement.  Matrix Acquisition

Corp. is identified as and described herein as the Merger Sub.  The sole stockholder of Merger Sub is Alipay UK.

29.     Defendants Alipay UK, the Guarantor and Merger Sub are entities substantially controlled by Ant Financial Services Group and referenced collectively herein as the "Ant Affiliates."

30.     Defendant Ant Financial Services Group was officially founded in October 2014 when it changed its name from Zhejang Ant Small and Micro Financial Services Company, Ltd., which originated from Alipay, which is the world's leading third-party payment platform founded in 2004.  Ant Financial Services Group is identified and described herein as Ant Financial.[1]

31.     The Individual Defendants, Defendants Ant Affiliates and Defendant Ant Financial are collectively referenced herein as "Defendants."

## JURISDICTION AND VENUE

32.     Pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  17 C.F.R. § 240, 14a-9.

33.     The Court has jurisdiction over Defendants because each is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. MoneyGram is incorporated within District and therefore is subject to its jurisdiction.

---

[1]      An entity known as Ant Financial Small and Micro Services Group Co., Ltd., is referred to as "Ant Financial" in the Proxy.  Based on information and belief, this entity is either doing business as Ant Financial Services Group or is a subsidiary owned by Ant Financial Services Group.

34.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because: (i) the conduct at issue took place, at least in part, and had an effect in this district; (ii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein through the vehicle of an Ohio Corporation occurred in this District; and (iii) defendants are engaging in numerous activities that had an effect in this District, including the incorporation of MoneyGram within this State.

## CLASS ACTION ALLEGATIONS

35.     Plaintiff brings this action on behalf of himself and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all owners of MoneyGram common stock, and their successors-in-interest, who are being and will be harmed by Defendants' actions described herein (the "Class"). The Class specifically excludes Defendants herein, and any person, firm, trust, corporation or entity related to, or affiliated with, any of the Defendants.

36.     The action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable. According the Company's most recent 10-Q, filed on October 28, 2016, there were 53,074,238 shares of common stock outstanding.

(b)      There are questions of law and fact which are common to the Class, including, inter alia, the following:

  i.     whether the Individual Defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other strategic alternatives, including offers from interested parties for the Company or its assets;

      ii.     whether the Individual Defendants misrepresented and omitted material facts in violation of their fiduciary duties owed by them to Plaintiffs and the other members of the Class;

     iii.    whether the Individual Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

     iv.    whether the Individual Defendants have violated Section 20(a) of the Exchange Act;

     v.     whether Plaintiff and the other members of the Class would be irreparably harmed were the Proposed Transaction complained of herein consummated; and

     vi.    whether the Class is entitled to injunctive relief or damages as a result of Defendants' wrongful conduct;

(c)    Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d)    Plaintiff's claims are typical of those of the other members of the Class;

(e)    Plaintiff has no interests that are adverse to the Class;

(f)    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

(g)     Conflicting adjudications for individual members of the Class might, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

(h)     Plaintiff anticipates that there will be no difficulty in the management of this litigation, and thus a class action is superior to other available methods for the fair and efficient adjudication of this controversy; and

(i)     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## BACKGROUND OF THE COMPANY

37.     MoneyGram is a publicly traded company and a global provider of innovative money transfer services. The Company offers products and services under its two reported segments: Global Funds Transfer and Financial Paper Products. The Global Funds Transfer segment provides global money transfer services and bill payment services to consumers. MoneyGram primarily offers services through third-party agents, including retail chains, independent retailers, post offices and other financial institutions. It also offers digital solutions such as moneygram.com, mobile solutions, account deposit and kiosk-based services. Additionally, MoneyGram has company-operated retail locations in the U.S. and Western Europe. The Financial Paper Products segment provides official check outsourcing services and money orders through financial institutions and agent locations.

38.     In late 2007 and early 2008, MoneyGram's stock price suffered steep declines and the Company's existence as a going-concern was in doubt. In order to salvage the Company, on

March 25, 2008, MoneyGram entered into a transaction with an investment group led by THL and Goldman Sachs to provide for a comprehensive recapitalization of the Company (the "Purchase Agreement").  Pursuant to the terms of the Purchase Agreement, THL may designate between two and four directors to serve on the Company's Board, who each have equal votes and are to have voting power proportionate to the Investors' common stock ownership. Therefore, each director nominated by THL has two votes and all other directors have one vote and collectively hold a majority of the voting power of the Board.  The Purchase Agreement also provides for the general attendance by two representatives of Goldman Sachs to observe at meetings of the Board.

39.     In addition to financial issues necessitating the Purchase Agreement, the Company was the subject of a DOJ probe into myriad illegal practices.  In November 2012, the Company announced that a settlement was reached with the U.S. DOJ relating to its illegal practices involving certain U.S. and Canadian agents, as well as fraud complaint data and the consumer anti-fraud program, during the period from 2003 to early 2009. In connection with this settlement, the Company entered into a deferred prosecution agreement ("DPA") with the U.S. DOJ dated November 8, 2012. Under the DPA, the Company agreed to the forfeiture of $100 million that would be made available as restitution to victims of the consumer fraud scams perpetrated through MoneyGram agents.  Also under the DPA, the Company agreed, among other things, to retain an independent compliance monitor for a period of five years, subject to adjustment to a shorter period under certain circumstances.  In the first quarter of 2013, Aaron Marcu, of Freshfields Bruckhaus Deringer, LLP, was selected as the independent compliance monitor. The Company received three annual reports from the compliance monitor, and reportedly continues to make investments in various areas related to compliance systems and

operations in order to comply with the DPA and recommendations of the compliance monitor. Upon information and belief, the monitor's engagement expires on or about November 2017.

40.    In addition to the weight of regulatory issues, the Company's stock price has lagged behind financial technology industry generally and its money transfer peers specifically since the financial crisis.  However, its recovery is not the only obstacle that Company has had to overcome since the Purchase Agreement was finalized.  In April 2014, the Company's outlook was adversely affected with the announcement that its long-standing partner Wal-Mart would be launching its own money transfer product in its U.S. locations starting on April 24, 2014.  Wal-Mart's money transfer program, while limited in scope and location, would also exert significant pricing pressure on the market with services coming at deep discount to MoneyGram's money transfer rates.

41.    In addition to the potential loss revenue from MoneyGram's largest agent by revenue entering the market as a competitor, the Company was adversely affected because on March 28, 2014, MoneyGram utilized debt to repurchase 8.2 million shares from THL at $16.25 per share for a total of approximately $133 million. Following the announcement of Wal-Mart's entry into the market, the Company's shares have not traded at or above $16.25 per share again.

42.    In an effort to spur a turnaround, the Company made significant investments on two fronts during 2015, which hurt short-terms results for the purposes of long-term gains.  First, the Company invested in and completed a majority of its reorganization and restructuring activities.  MoneyGram made these investments to diversify its expense base and reinvest into broader growth initiatives specifically in the digital and self-service sectors and the international market.  Further, the Company was required to make significant and continued investments into its compliance enhancement program to meet the demands of the regulatory environment.

43.     On February 11, 2016, the New York Attorney General Eric Schneidermann announced a settlement with MoneyGram resolving a multistate investigation focusing on claims that MoneyGram's wire transfer services were utilized in the commission of fraud against consumers.   In addition to New York, forty-eight other states and the District of Columbia participated in the settlement.   In connection with the settlement, the Company agreed to maintain and continue to improve a comprehensive anti-fraud program designed to help detect and prevent consumers from suffering financial losses as a result of fraud-induced wire transfers. MoneyGram also agreed to pay a total of $13 million to the states to fund a nationwide consumer restitution program and for the states' costs and fees.   Following this announcement and prior to release of its full year and fourth quarter 2015 earnings, MoneyGram's stock hit a 5-year low close of $4.75 per share.

44.     However, on February 12, 2016, when the Company announced its full year and fourth quarter 2015 earnings, MoneyGram was able to surprise the market by beating 2016 4Q estimates with earnings of $0.16 per share compared to analyst estimates of $0.15 per share. MoneyGram also reported 4Q revenue of $376.7 million, an increase of 8% on a reported basis and 11% on a constant currency basis.  Adjusted EBITDA was $65.2 million, a 10% increase on a reported basis and 12% increase on a constant currency basis.  With respect to its Digital/Self-Service sector, MoneyGram reported strong customer adoption with money transfer transactions increasing 42% in this sector.   Further, the Company's earnings reflected gains in its international business  resulting from both Non-U.S. send transactions, which grew by 15% led by sends from Europe and emerging markets, and U.S. Outbound transactions, which grew 10% led by sends to Latin America and Africa.  The Company's guidance for full year 2016 was

constant currency revenue and Adjusted EBITDA growth of 8% to 10%.  In the announcement, Defendant Holmes was quoted as stating the following:

> "Moving forward, we are focused on providing an industry leading customer experience at every interaction with our brand, wherever and however our customers choose to transact[.]  We are excited about the many initiatives we have in place to differentiate our company and drive growth through the strength of our hybrid money transfer model – bridging the digital and physical worlds through our Digital/Self-Service solutions and global agent network."

45.     On April 29, 2016, MoneyGram reported its financial results for the first quarter of fiscal 2016 ended March 31, 2016.  The Company reported total revenue of $358.4 million, an increase 8% on a reported basis and 10% on a constant currency basis.  Adjusted EBITDA of $69.8 million represented an increase of 28% on a reported basis and 29% on a constant currency basis.  The Company explained that the large increase in Adjusted EBITDA was principally due to incremental foreign currency income, favorable commission rates, and lower marketing spending.  With respect to money transfers, MoneyGram reported that money transfer transaction growth of 7% in the first quarter and money transfer revenue of $316.2 million, representing 10% growth a reported basis and 12% growth on a constant currency basis compared to the prior year.  MoneyGram credited the money transfer revenue growth to the continued strength in the Company's Non-U.S. and U.S. Outbound sends.  Similarly, the Company's Digital results were also promising – digital money transfer transactions increased 23% and digital money transfer revenue grew 31% over the prior year.  Based on these results, the Company reaffirmed its revenue guidance of 8%-10% constant currency revenue growth and increased its outlook for full year constant currency adjusted EBITDA growth to 9%-11%.  In connection with the announcement, Defendant Holmes stated the following:

> "We delivered strong revenue and adjusted EBITDA growth in the quarter.  Our strategic focus on targeted corridor development,

optimization of the customer experience, and prudent expense
controls were key to these results[.]"

46.     On July 29, 2016, MoneyGram announced its 2016 second quarter financial

results.  The Company reported total revenue for the quarter of $383.7 million, which was an

increase of 7% on a reported and constant currency basis.   Additionally, Adjusted EBITDA for

the quarter was $61.2 million, an increase of 6% on a reported basis and 7% on a constant

currency basis.  Despite being forced to cut the Company's constant currency revenue growth

due to economic and geopolitical issues, Defendant Holmes still stated the following regarding

the Company's performance and outlook:

> "MoneyGram performed well in the second quarter with solid
> improvements to key financial metrics as the global nature of our
> business enabled us to deliver bottom-line growth within our
> expectations[.]   Economic and geopolitical issues in certain
> countries accelerated during the quarter and impacted our top-line
> performance.   As a result, we now expect constant currency
> revenue growth of 7% to 9%, which primarily reflects the ongoing
> impact of slower growth in these countries.  We remain focused on
> disciplined expense management while continuing to capitalize on
> profitable growth and expansion initiatives.   Therefore we are
> maintaining our outlook for constant currency adjusted EBITDA
> growth of 9% to 11%.  Importantly, our team is hard at work,
> implementing technologies that, combined with our global
> network, will differentiate the MoneyGram brand.   We are
> energized to gain market share through delivered a superior
> customer experience."

47.     Despite the disappointing, top-line results, the Company still reported $341.5

million in money transfer revenue, which represented an 8% increase on a reported and constant

currency basis.   MoneyGram credited its money transfer revenue growth to the "continued

strength" in the Company's Non-U.S. (11% growth on a reported basis and 12% on a constant

currency basis) and U.S. Outbound (10% on a reported and constant currency basis) sends in the

second quarters.  The Company's digital sector also performed well with digital money transfer

revenue growing 17% over the prior year.

48.     On October 28, 2016, MoneyGram reported its third quarter 2016 financial results.  The Company announced that total revenue for the quarter was $383.1 million, which represented an increase of 4% on a reported basis and 5% on a constant currency basis.  Adjusted EBITDA for the quarter was $68.7 million, which was an increase of 5% on a reported basis and 8% on a constant currency basis.  MoneyGram reported money transfer revenue for the quarter of $339.6 million, which represented a 4% increase on a reported basis and 5% on a constant currency basis.  These money transfer revenue totals reflected "continued growth" in the Company's Non-U.S (4% on a reported basis and 6% on a constant currency basis) and U.S. Outbound sectors (8% on a reported and constant currency basis).  Additionally, the digital sector continued to perform well with transfer revenue growth of 12% over the prior year.  In connection with the announcement, Defendant Holmes was quoted as stating:

> "Our focus on driving profitability yielded solid improvements to key financial metrics in the third quarter including gross margin, operating profit, EBITDA, net income and cash flow, resulting in a strengthened balance sheet[.]  The quality of our earnings also improved even as revenue growth continued to be impacted by economic challenges in certain countries and geopolitical issues. We are navigating these challenges and remain confident in the fundamentals of our business as we capitalize on profitable growth through new products and global expansion opportunities.
>
> We are excited to be a leader in the digital revolution that is overhauling the customer experience and transforming the money transfer industry.  Innovative products including MoneyGram Kameleon, MoneyGram MobilePass, our award winning website, mobile app and kiosks showcase MoneyGram's capabilities in financial technology and bring us closer to our customers.  As we overlay these capabilities with our expanding global cash-based physical network of agent locations, our value proposition becomes even more distinct, our relationships with our customers even more dynamic, and our future growth prospects even stronger."

49.     On November 14, 2016, Feltl and Company analyst Joshua J. Elving published an analyst report rating MoneyGram as a "Strong Buy."  In his report, Elving explained that the

Company was at an inflection point with investors "due to stronger-than expected cash flow generation that should provide greater flexibility to reduce leverage and invest in growth." Elving even labeled the Company as "our top pick in financial technology" with a price target of $12.00 well above the then-current trading price of $9.66.

50.     On November 15, 2016, the Company held a conference call at the JPMorgan Ultimate Services Investor Conference.  During the call, Defendants Holmes and Angelilli spoke glowingly about the state of the Company and its future prospects.  In particular, Holmes made the following statements about the Company's investments in business and potential for future growth:

> "You want customers to choose.  They have a lot of choice and they have a lot of convenience today and so you got to drive that customer to say I want MoneyGram and I'm going to bring them into the fold.  At the same time we're seeing huge pressures globally from almost every market to better understand, better regulate and better control, KYC who's your customer.  So the compliance side of things.  And so what we bring to the table is a beautiful network that's built out across 200 countries and territories and we have the local compliance knowledge, we have the local regulatory knowledge, we have all the local banking relationships, and so we have the connections and the touchpoints. So, we can address those issues head on and we've making those investments which I know have been kind of painful on the cash side.
>
> On the flip side, it's putting us in great position where we're centering all our focus on really the creation of this customer profile.  And the idea being on a go-forward basis, you're going to see us really focused on how does that profile affect a transaction versus how does a transaction sort of affect the consumer.  So, we're taking a completely different view of how the business operates.
>
> *        *        *        *        *        *        *        *        *
>
> So we're really trying to build and we will build and deploy a much more omnichannel focus than sort of this hybrid money transfer model and the idea being you overlay that with beautiful digital technologies over the top, interaction with the customer

changes, your ability to fight for the customer is linked to sender and receiver, send them all sorts of information like you might get today when you're doing online services, but bring that to the physical world as well. And I think the nexus of that is going to be increased customer adoption. I think it's going to be increased consumer usage, moving them from one transaction to two to three to four to five, increasing our market share in various countries and giving our customers sort than omnichannel funding. And so when I send money to you in a foreign country, you shouldn't have to go pick it up at a certain location.

You should just be notified money is available and then you decide where to go pick it up. So, all that's coming to life right now and we're pushing that in the marketplace and when you back that up with kind of what we have on the compliance, legal regulatory, and banking side; it's fantastic because we don't have to create those pipes, we don't have to build that network. It's already there, what we're doing is really expanding that network and changing the dynamics of it."

51.     During the call, Mr. Holmes talked further about the Company's avenues for

growth and how MoneyGram would reap the benefits of its investments:

"We're really trying to scale into being a global company. We've also invested in the last seven, eight years to really professionalize, for lack of a better term, it's sort of an internal term. But we didn't have a lot of the core operations fully functioning that we needed. FX for example was a couple of people done out of the United States and now we have a distributive FX management department that spans the world so we can trade currencies real time in markets. Just illustrative of kind of the difference, we have a huge operations center in Poland which used to be only in Minneapolis, United States.

So we've put a lot of effort into making sure that we're global number one; and then number two, that we're kind of matching our expenses to our revenues so that we're trying to put as much expense against in markets where can so that if there are volatilities and currencies moving around and changes in those market dynamics that those expenses are fluctuating with those revenues. So I think we've got a long way to go on scale. I don't you're going to see continuing to do some operational structural changes. I think our reliance on systems, tools and technology should continue to enable use to hold on to some headcount and scale, differently outsource a little more perhaps. So there's some

real opportunities I think from a partnership perspective to drive
more profitability without really putting the Company at risk."

52.     Additionally during the conference call, Defendant Angellili explained that

competitors that have no made the investment with compliance will lag behind MoneyGram.  In

pertinent part, Defendant Angellili stated, as follows:

> "I think that for those who compete with us but haven't made these
> investments, the laws come in and then they anticipate that if the
> technology is available that you're supposed to be capable of
> implementing it.  So, you better have the technology.  We think
> this is going to cause the industry to actually have to spend more
> and we think we have sort of a little bit of an advantage there
> because we've already done it.  So, we're capable of making these
> changes, but we think the industry as a whole is going to have to
> spend some money to catch up."

53.     Following the positive third quarter 2016 financial results and statements from

analysts and senior management the Company's stock price soared.  On October 27, 2016, the

day before MoneyGram announced its third quarter 2016 financial results, MoneyGram's stock

closed at a price of $6.05 per share. The stock trended upwards and December 19, 2016, the

Company's stock price closed at $12.33 per share – more than double what the Company was

trading at before its third quarter 2016 financial results were announced.

54.     On December 20, 2016, Feltl and Company ("Feltl"), published another analyst

report on the Company stating that although the Company's shares were trading above the

$12.00 target price, Feltl was still rating the Company's stock as a "Buy."   Further, Feltl

anticipated that the target price would be raised to approximately $15.00 upon release of the

Company's financial results for the fourth quarter of 2016.

55.     As reflected in the analyst reports, senior management's statements and in the

Company's recent financial results, MoneyGram is poised for significant growth and expansion,

and is expected to yield returns for the Company and its shareholders well into the future.

However, despite the potential financial growth of the Company and the return on its significant investments that it is poised to achieve, the Individual Defendants have entered into the Merger Agreement with Ant Financial and the Ant Affiliates, depriving the Plaintiff and the public shareholders of the Company the opportunity to participate in the growth of the Company in which they have loyally invested.

## THE FLAWED PROCESS AND THE FALSE AND MISLEADING STATEMENTS CONCERNING THE BACKGROUND OF THE MERGER

56.     As revealed by the Proxy, the Merger Agreement and the Proposed Transaction is the result of a skewed process, which was rife with conflicts and inconsistencies.  MoneyGram's financial advisor, BofA Merrill Lynch had conflicts on all sides of the Proposed Transaction and the process, which were not revealed to the Board until the Proposed Transaction was in its final stages.  Additionally, the Proxy is completely inadequate with respect to the information that it provides shareholders regarding the nature of these apparent and obvious conflicts of interest.

57.     Further, there was no uniformity in how the Company treated bidders and no formal auction process as the Company received only one formal offer from any bidder – Ant Financial – at a price, which was an entirely inadequate 11.5% premium to the closing price on the day preceding the announcement of the Proposed Transaction.  The process was tilted in favor of Ant Financial, the Individual Defendants and substantial Company shareholders – THL and Goldman Sachs – to the detriment of the Company's public, non-insider shareholders' interests.

58.     The sales process began in earnest in February 2016, when Party A, a financial services company, approached the Company to discuss a potential strategic combination.  The two companies engaged in strategic discussions through the spring and summer of 2016.  The Proxy does not disclose, what if any sort of strategic transactions were considered and discussed

with Party A.  Notably, the Proxy does not state whether Party A ever conducted any significant due diligence on MoneyGram, whether the Company's representatives including Mr. Holmes approached Party A about entering into a confidentiality agreement or standstill agreement as it did with certain other bidders, nor does the Proxy disclose who Party A is or identify Party A's advisors, despite there being no confidentiality agreement in place.

59.     Further, with respect to Party A, the Proxy does not reveal whether MoneyGram and/or Party A conducted the "joint regulatory analysis" mentioned in the Proxy, the results of such analysis, or whether the results of that analysis caused discussions to cease.  Despite engaging with Party A in potential strategic discussions for five months, according to the Proxy, the Company did not retain a financial advisor in connection with such discussions.  Even though MoneyGram and Party A spent nearly five months talking earlier in 2016, the Company and Individual Defendants did not approach them after the Board had essentially resolved itself to selling the Company to Ant Financial.

60.     During the summer of 2016, MoneyGram also engaged in conversations with Parties B and C, who are described as "financial sponsors" in the Proxy, regarding a potential strategic combination.  The Proxy explicitly states that the Company entered into confidentiality and standstill agreements with these financial sponsors.  However, there is no explanation for inconsistencies between the process with respect to Party A (no confidentiality or standstill agreements despite the prolonged process) and Parties B and C (confidentiality and standstill agreements seemingly upfront at start of process).  Parties B and C were given access to an online data room and it appears that Party A did not receive such access.  The Proxy also discloses that Party C originally contacted THL regarding a potential acquisition of MoneyGram,

but does not identify the THL representative that was contacted and whether that THL representative was presently on the Board.

61.     With respect to Parties A, B and C, the Proxy does not disclose whether the early indications of interest included any indications as to a price where those companies would consider a transaction.  The Proxy merely states that these parties indicated that they would not provide valuation information or a proposal for the Company at the conclusion of their respective discussions.

62.     On October 4, 2016, Defendant Holmes and other members of MoneyGram management met with Ant Financial for the first time in relation to the Proposed Transaction.  At this meeting, Ant Financial and the Company discussed "potential strategic business opportunities," however, it is unclear from the Proxy whether these "opportunities" included a potential acquisition of MoneyGram by Ant Financial or the Ant Affiliates or a different transaction altogether.  The Proxy discloses that MoneyGram began having discussions with Ant Financial regarding potential commercial relationships between the Alipay business and MoneyGram in April 2016.  However, the Proxy does not adequately elaborate when or if these "potential commercial relationships" were taken off the table by Ant Financial.  The Proxy does not disclose the nature of these "potential commercial relationships" and whether they could have a material effect on the Company's outlook or business had they been completed.

63.     The Proxy further discloses that on October 25, 2016, Defendant Holmes and representatives from MoneyGram met with representatives from Party D, a financial services company, to discuss the possibility of a strategic transaction involving the two entities. However, it is not clear how such a meeting came about, whether the Company was actively seeking out

potential strategic partners at this time, or whether Party D simply approached the Company about a potential strategic combination.

64.     Also on October 25, 2016, Defendant Holmes met alone with representatives from Ant Financial.  During the meeting, Ant Financial expressed an interest in acquiring MoneyGram and the parties discussed next steps in connection with a potential strategic transaction including the necessity of the parties entering into a confidentiality agreement.  Once again, it is unclear why it was necessary for the Company to enter into a confidentiality agreement with a potential strategic partner – Ant Financial, in this case – but it did not with Party A when the process began.  Additionally, it is unclear whether Defendant Holmes received authorization from the Board to discuss a potential sale of the Company or whether the Board had resolved itself to a private auction sale process, at this time.  In any event, neither is reflected in the Proxy.  Further, the Proxy does not disclose if there were any discussions concerning Ant Financial's desire to retain any member of MoneyGram's senior management team, including Mr. Holmes, occurred at this time or when such discussions occurred in the future.

65.     On October 29, 2016, Ant Financial provided MoneyGram an initial draft confidentiality agreement.  On November 11, 2016, MoneyGram and a subsidiary of Ant Financial entered into a confidentiality and standstill agreement.  The Proxy does not disclose whether the Board discussed the confidentiality agreement with any legal advisors or made any changes to the draft confidentiality agreement (and if so, what those changes were).  Further, the Proxy does not disclose whether the standstill agreement was in the initial draft, or was added in a subsequent draft and by whom.  The Proxy also fails to disclose why an Ant Financial subsidiary was  party to the confidentiality and standstill agreement as opposed to Ant Financial itself, and which subsidiary was a party to the disclosed confidentiality and standstill agreement.

66.     On November 8, 2016, Party E, a publicly-traded payment services company, contacted representatives of THL to discuss a potential strategic transaction involving MoneyGram and Party E.  However, the Proxy does not disclose the identity of the THL representative, who was contacted, and whether they were a member of the Board.

67.     In mid-November of 2016, Defendant Patsley had preliminary communications with Party E regarding a potential strategic transaction involving Party E and MoneyGram. Then, on November 16, 2016, at the request of Party E, Defendant Rao had a meeting with Party E during which they discussed a potential strategic transaction involving Party E and MoneyGram.  The Proxy states regarding that meeting that the THL "representative did not discuss a potential valuation of MoneyGram."  It is unclear from this statement whether the Proxy is referring to Mr. Rao or another person from THL.

68.     On November 18, 2016, Party E communicated to MoneyGram an indication of interest in a potential strategic transaction involving Party E and MoneyGram that would value MoneyGram at an enterprise value of $1.75 billion.  The Proxy does not disclose whether MoneyGram approached Party E about a confidentiality or standstill agreement, as it had with certain other bidders, which would allow Party E access to the same online dataroom that was made available to Ant Financial.  Further, the Proxy does not disclose why the Company directed Party E to negotiate and discuss a potential transaction through BofA Merrill Lynch, especially after Party E had actually provided a valuation figure, while Defendants Patsley and Holmes along with MoneyGram senior management took the lead in negotiating with Ant Financial, which did not provide an indication of interest valuation until December 14, 2016.

69.     On November 25, 2016, after engaging in negotiations with six separate bidders over the course of nine months, Defendants Patsley, Holmes and Rao had a discussion with the

representatives of BofA Merrill Lynch regarding MoneyGram's potential retention of BofA Merrill Lynch as the Company's financial advisor in connection with a potential strategic transaction.  The Proxy fails to disclose whether the Board actually discussed the retention of a financial advisor prior to this meeting and why the Board believed it was necessary to do so at this time as opposed to earlier in the process.  Further, the Proxy does not disclose whether the Board, or any of its members, met with or even discussed any other financial advisor candidates including its unidentified financial advisor that partnered with BofA Merrill Lynch, when the Company was considering a potential strategic transaction in 2013.

70.     The Proxy explained that MoneyGram was interested in retaining BofA Merrill Lynch because of BofA Merrill Lynch's extensive experience in the merger and financial services industry and its longstanding relationship with the Company.  However, the Proxy does not disclose whether there were any discussions at the Board or senior management levels concerning BofA Merrill Lynch's potential conflicts at this time or any time before January 5, 2017 nearly a month and a half later.

71.     On November 30, 2016, Defendant Patsley and a representative from Party E discussed Party E's preliminary indication of interest.  Defendant Patsley advised Party E that MoneyGram expected to engage BofA Merrill Lynch as its financial advisor and that Party E would be contacted by representatives from BofA Merrill Lynch.  The Proxy does not disclose whether Defendant Patsley received approval from the Board to retain BofA Merrill Lynch on an informal basis.

72.     Also on November 30 and December 1, 2016, MoneyGram representatives including Defendants Patsley and Holmes among other members of executive management, had a series of meetings with Ant Financial during which management made presentations regarding

the Company's operations, financial performance, regulatory compliance programs and strategic plan.  The Proxy does not disclose whether any such presentation was made to Party E, which had provided an indication of interest, or any other bidder and if not, why this presentation was only made to Ant Financial.

73.     On December 5, 2016, BofA Merrill Lynch representatives discussed with Party E representatives whether Party E planned to make a formal proposal to acquire MoneyGram and what the timing of such proposal would be.  The Party E representatives indicated that it would be discussed at a board meeting later in the month.  The Proxy does not disclose why the Individual Defendants and MoneyGram required clarification from Party E on a formal proposal just seventeen days after receiving an initial indication of interest, while it sought no such clarification from Ant Financial, which did not provide an opening indication of interest valuation until December 14, 2016 after Party E provided an initial indication of interest valuation and nearly seven weeks of negotiations between MoneyGram and Ant Financial.

74.     On December 7, 2016, the Board reviewed recent discussions with Ant Financial and Parties D and E.  The Proxy discloses that the Board reviews "its intention to formally engage BofA Merrill Lynch to advise MoneyGram in connection with any potential transaction." However, the Proxy does not disclose whether a conflicts analysis was performed concerning BofA Merrill Lynch at this time, nor does the Proxy disclose when the Board had declared its intention to formally engage BofA Merrill Lynch in the first instance.

75.     Additionally, the Proxy discloses that Defendant Patsley advised the Board that Goldman Sachs had requested access to non-public information with respect to any potential strategic transaction and recommended that the Company share the information with Goldman Sachs provided that it enters into an appropriate confidentiality agreement.  The Proxy does not

disclose Defendant Patsley's reasons for recommending that Goldman Sachs be permitted access to the non-public information concerning a potential transaction especially considering Goldman Sachs's shares were non-voting shares.

76.     On December 13, 2016, representatives from Party D and its financial advisor met with representatives from MoneyGram, including Defendant Holmes and BofA Merrill Lynch. These discussions were based on publicly available information because MoneyGram and Party D had not entered into a confidentiality agreement.  The Proxy does not disclose the identity of Party D or its financial advisor despite the lack of any confidentiality agreement.  Further, the Proxy does not offer an explanation as to why MoneyGram and Party D had not entered into a confidentiality agreement to advance the process.

77.     On December 14, 2016, Party E indicated to Defendant Patsley and BofA Merrill Lynch that it was no longer interested in pursuing a strategic transaction because of the substantial increase in MoneyGram's stock price and concerns related to financing the transaction.  Party E also advised MoneyGram that its earlier indication of interest was intended to imply an offer price between $11.00 and $12.00 per share, which was less than the then-current trading price of MoneyGram's common stock.  The Proxy does not disclose what Party E's concerns were with respect to financing.  Further, the Proxy does not indicate whether the Board, BofA Merrill Lynch or any other MoneyGram representative contacted Party E later in the process when the premium being offered as consideration was so low compared to MoneyGram's then-current stock price.

78.     On December 15, 2016, the Board held a special meeting to discuss recent developments with Ant Financial and Parties D and E.  At this meeting, BofA Merrill Lynch presented a preliminary financial analysis related to valuation of MoneyGram.  Further, the

Board discussed the regulatory and closing risks of a potential transaction with Ant Financial. The Board resolved to instruct MoneyGram's management team and financial advisors to seek a specific price proposal from Ant Financial above the $12.50 to $13.00 per share indicated by Ant Financial.   The Board also instructed management and its advisors to explore whether the expression of interest from Party D could develop into a fully formed proposal.   The Proxy does not disclose the types of preliminary financial analyses reviewed at this Board meeting, nor does it establish whether the Board had established an acceptable price or range of prices at which it would agree to sell the Company.

79.    From December 20 through December 22, 2016, Ant Financial and MoneyGram participated in due diligence discussions.   During these meetings, BofA Merrill Lynch indicated to Ant Financial's financial advisor, CitiGroup that MoneyGram would not make sensitive due diligence information available without an improved transaction price and additional clarity regarding key transaction terms.   The Proxy states that the Board believed the valuation range of $12.50 to $13.00 per share was not definitive and in any event, did not fully value MoneyGram. However, the Proxy does not disclose if the Board had established what price or price range would fully value MoneyGram.

80.    On December 22, 2016, Party D submitted a written list of due diligence topics to MoneyGram.   MoneyGram advised Party D that it would need to enter into a confidentiality agreement prior to receiving the requested information.   The Proxy does not disclose whether any effort was made after the December 15, 2016, Board meeting by any MoneyGram representative to develop Party D's indication of interest into a more fully formed proposal prior to Party D's December 22, 2016 diligence request.

81.     On January 2, 2017, Ant Financial indicated that it would propose acquiring MoneyGram at a price of $12.75 per share in cash, the middle range of the indication of interest previously made by Ant Financial.  Later, on January 2, 2017, Simpson Thacher & Bartlett LLP ("Simpson Thacher"), Alipay UK's legal advisor, delivered a draft merger agreement to Vinson & Elkins L.L.P. ("V&E"), MoneyGram's legal advisor.

82.     On January 3, 2017, MoneyGram delivered to Party D, through their respective financial advisors, a draft confidentiality agreement.  The Proxy does not disclose who was acting as Party D's financial advisors and why MoneyGram waited two weeks to provide Party D with a draft confidentiality agreement.  Further, the Proxy fails to disclose what additional steps, if any, MoneyGram representatives took to develop Party D's indication of interest into a fully formed proposal.

83.     On January 5, 2017, representatives from BofA Merrill Lynch furnished information to the Board regarding its material relationships with THL and Goldman Sachs (from each of which BofA Merrill Lynch derives significant revenue), as well as with Ant Financial, Alibaba Group Holding Limited, Party D and Party E .  Further, BofA Merrill Lynch represented that it (and members of the deal team) would continue to meet with and provide services to THL, Goldman Sachs, as well as Party D and E.  Additionally, BofA Merrill Lynch explained that it regularly provides advice to Party D with respect to strategic alternatives, some of which could be mutually exclusive to an acquisition of MoneyGram by Party D.  However, BofA Merrill Lynch did reveal to the Board that Party D had retained another investment bank in connect with discussions with MoneyGram.  Despite these conflicts, the Board declared that they did not adversely affect BofA Merrill Lynch's independence or ability act as a financial advisor on MoneyGram's behalf.

84.     In addition to BofA Merrill Lynch being riddled with conflicts in connection with the Proposed Transaction, the Individual Defendants abdicated their fiduciary duties by failing to conduct this conflicts analysis earlier when BofA Merrill Lynch was informally retained by a segment of the Board (according to the Proxy's disclosures).  By waiting this long to conduct such an analysis, the Individual Defendants and the Company's process was already irreparably flawed because BofA Merrill Lynch was already so intimately involved prior to even being formally retained by the Board.  Even more egregious, the Board did not request that BofA Merrill Lynch at least recuse the deal team members that were meeting with and providing services to THL, Goldman Sachs, Party D and Party E.

85.     The Proxy fails to disclose substantive detail regarding what BofA Merrill Lynch disclosed to the Board regarding its material relationships with Ant Financial and Alibaba Financial Holding Limited.  Further, the Proxy fails to provide sufficient detail regarding the nature of BofA Merrill Lynch's relationship with Party D, the revenue it derives from such relationship with Party D and further clarification on the strategic alternatives, which could be mutually exclusive to an acquisition of MoneyGram by Party D including whether BofA Merrill Lynch's fees are incentivized by the closing of a mutually exclusive transaction by Party D.  The Proxy also fails disclose sufficient detail regarding the structure of BofA Merrill Lynch's fee arrangement and whether the Board considered whether the highly incentivized structure, whereby BofA Merrill Lynch would receive $13 million (of $14 million total) upon consummation of the Proposed Transaction, created another conflict of interest.

86.     Also on January 5, 2017, the Board discussed developments in discussions with Ant Financial, including the $12.75 per share cash proposal from Ant Financial and the draft merger agreement.  During this discussion, the Board considered the Ant Financial proposal in

the context of other indications of interest, its 2013 strategic review process, the likelihood that a third party would make proposal to acquire MoneyGram on substantially similar or better terms than those proposed by Ant Financial, and the Company's prospects as a stand-alone entity. BofA Merrill Lynch did not believe it was likely that soliciting interest from additional parties beyond Parties D and E would result in a proposal on better terms than Ant Financial's proposal. Further, BofA Merrill Lynch also discussed the potential negative consequence of running a broad strategic review process including the potential public nature of such a process and the likelihood that Ant Financial would not participate in that process.  The Proxy does not disclose what BofA Merrill Lynch considered the likelihood of Ant Financial participating in a public auction would be, nor does it disclose any detail concerning the potentially negative consequences that were discussed with the Board regarding a broad strategic review process. Moreover, the Proxy does not indicate whether the advantages of a public auction were discussed with the Board at this time.

87.     At the outset of this meeting the Board determined that the Company's representatives should continue to negotiate with Ant Financial with the goal of improving the proposed $12.75 per share consideration and limiting the deal certainty risk in the transaction. The Board also resolved that management and BofA Merrill Lynch should continue to encourage Party D to enter in a confidentiality agreement and make a definitive proposal.  The Proxy does not disclose whether the Board had established a price (or price range) that it would deem acceptable.

88.     On January 5, 2017, Simpson Thacher delivered to V&E a draft voting and support agreement intended for THL.  The Proxy does not disclose whether V&E was also acting as counsel to THL in connection with the Merger Agreement.

89.     On January 6, 2017, Defendant Patsley advised Ant Financial representative, Douglas Feagin, that MoneyGram's Board did not view the $12.75 price as acceptable and that additional items regarding deal certainty would need to be addressed.

90.     On January 10 and 12, 2017, BofA Merrill Lynch contacted Party D's financial advisor to inquire about the status of the draft confidentiality agreement and to encourage the submission of a proposal from Party D.  On January 13, 2017, BofA Merrill Lynch contacted Party D's financial advisor via e-mail to inquire about the status of the draft confidentiality agreement and a proposal.  The Proxy does not disclose whether a member of management tried to reach out to Party D regarding the status of the draft confidentiality agreement or negotiations or if BofA Merrill Lynch was solely responsible for contacting Party D despite its conflicts.

91.     On January 14, 2017 and January 17, 2017, V&E and Simpson Thacher exchanged merger agreement drafts.

92.     On January 18, 2017, V&E delivered a revised draft of the THL voting agreement to Simpson Thacher, which reflected input from THL's legal advisor, Weil Gotshal & Manages LLP ("Weil").  The Proxy does not disclose when Simpson Thacher retained Weil in connection with this matter.

93.     Also on January 18, 2017, the Board held a meeting with its legal and financial advisors.  During this meeting, the failure of Party D to enter into a confidentiality agreement or make a proposal for a transaction with MoneyGram was discussed.  The Board also discussed with its advisors the state of negotiations with Ant Financial and resolved to continue negotiation with Ant Financial with a focus on securing a higher price and deal terms that would minimize the uncertain closing of the Proposed Transaction.

94.     On January 19, 2017, V&E distributed to Simpson Thacher a proposal for changes to the terms of the merger agreement and on January 20, 2017, V&E delivered to Simpson Thacher a revised draft merger agreement consistent with MoneyGram's latest proposal.

95.     On January 20, 2017, Ant Financial delivered to MoneyGram drafts of the debt commitment letter and fee letter.  Also on January 20, 2017, BofA Merrill Lynch once again inquired with Party's D financial advisor regarding the status of the draft confidentiality agreement and requested a non-binding proposal with respect to a strategic transaction involving MoneyGram and Party D by January 25, 2017.  The Proxy does not disclose whether the Board or management gave BofA Merrill Lynch the directive to provide Party D with a deadline for producing a proposal.

96.     On January 21, 2017, Defendant Patsley and Mr. Feagin discussed outstanding issues regarding the terms of a potential transaction and on January 22, 2017, Simpson Thacher delivered a revised draft of the merger agreement to V&E.  Further, on the same day, Simpson Thacher also delivered to V&E a draft of the written consent of Goldman Sachs, MoneyGram forwarded to representatives of Goldman Sachs for their consideration.

97.     On January 23, 2017, the Board met with its advisors regarding the state of negotiations with Ant Financial.  During this meeting, the Board discussed open issues, potential negotiating strategies and how to best balance the twin goals of achieving additional value and certainty of closing in further negotiations.  The Proxy does not disclose what strategies were discussed, considered, decided upon or discarded during the course of the meeting.  The Board resolved to continue negotiations in hopes of achieving a greater price than $12.75 coupled either with terms that would ensure greater certainty that the transaction would close or alternatively, a termination fee commensurate with the costs to MoneyGram of a failed transaction.  The Proxy

does not disclose whether the Board or its advisors discussed or had performed an analysis of what a potentially failed transaction with Ant Financial and the Ant Affiliates would cost the Company.  Moreover, the Proxy fails to disclose whether the Board had determined what price point or range would be acceptable consideration.

98.    After the meeting with the Board, Defendant Patsley called Mr. Feagin to discuss open key issues with respect to the potential transaction.  At the outset of this conversation, the parties resolved that the purchase price would be increased to $13.25 in cash per share and that the merger agreement would not include a go-shop provision, among other things.  This agreement was subject to approval of the Board and agreement on additional open items.

99.    Following this call, on January 24 and 25, 2017, the Company's Board and their advisors met to finalize the terms of the Merger Agreement and other supporting documentation including the payment guarantee, which provides credit support to backstop up to $45 million of Alipay UK's obligations to pay a reverse termination fee.

100.    Later in the afternoon on January 25, 2017, the Board convened with its advisors. BofA Merrill Lynch presented updated financial analyses with respect to the revised offer of $13.25 in cash per share.  Despite its presentation, BofA Merrill Lynch did not express any formal opinion regarding the fairness of the Proposed Transaction at this meeting.  The meeting concluded with the Board determining that it was generally supportive of the merger, subject to resolution of final open items.  On January 26, 2017, with the terms of Proposed Transaction finalized, the Board unanimously approved the Proposed Transaction.

**THE PROPOSED TRANSACTION**

101.   Despite the Company being positioned for significant future growth, on January

26, 2017, the Company and Ant Financial issued a press release announcing the Proposed

Transaction.  The press release stated, in pertinent part:

> DALLAS, Texas and HANGZHOU, China, Jan. 26, 2017
> /PRNewswire/ -- MoneyGram (NASDAQ: MGI), a global provider
> of innovative money transfer services, and Ant Financial Services
> Group, one of the world's leading digital financial services
> providers and parent company of Alipay, a global mobile payment
> platform, today announced that they have entered into a definitive
> agreement under which MoneyGram will merge with Ant
> Financial, with stockholders of MoneyGram being offered $13.25
> per share in cash. The transaction will connect MoneyGram's
> money transfer network of 2.4 billion bank and mobile accounts
> and 350,000 physical locations with Ant Financial's users, who
> enjoy a broad suite of technology-based financial services,
> including payments, credit and insurance products. The
> combination will provide consumers in over 200 countries and
> territories with convenient and accessible financial services, which
> furthers Ant Financial's mission to promote equal access to
> financial services globally.
>
> The services of MoneyGram and Ant Financial are highly
> complementary. MoneyGram, which will remain headquartered in
> Dallas and continue to operate under its existing brand, will be able
> to leverage Ant Financial's global presence and existing network to
> serve more than 630 million users -- including 450 million with
> Alipay and 180 million with India's leading mobile payment
> provider Paytm -- to increase MoneyGram's transaction volume
> across the broad Asia-Pacific region. The transaction will also help
> expand Ant Financial's business in new global markets following
> its recent partnerships with Paytm in India and Ascend Money in
> Thailand.
>
> "The acquisition of MoneyGram is a significant milestone in our
> mission to bring inclusive financial services to users around the
> world," said Eric Jing, Chief Executive Officer of Ant Financial.
> "We believe financial services should be simple, low-cost and
> accessible to the many, not the few. The combination of Ant
> Financial and MoneyGram will provide greater access, security
> and simplicity for people around the world to remit funds,
> especially in major economies such as the United States, China,
> India, Mexico and the Philippines."

Mr. Jing continued: "One of MoneyGram's greatest strengths is its high-quality team of employees. We are committed to continuing to invest in MoneyGram's workforce and growing jobs in the United States, where MoneyGram has made a mark with outstanding customer service, innovative products and industry-leading technology and compliance programs."

"This transaction will significantly benefit consumers throughout the world who depend on innovative and reliable financial connections to friends and family," said Alex Holmes, Chief Executive Officer of MoneyGram. "MoneyGram can now accelerate and expand our suite of global hybrid solutions and integrate an even larger digital and physical network, making money transfers easier for customers and providing a wider selection of services for the agents who serve them around the world. Ant Financial is an ideal partner for MoneyGram; together, we will be able to expand our business and, in doing so, offer more people around the world access to a reliable financial connection to loved ones."

102.  On January 26, 2017, the Company filed a Form 8-K with the SEC wherein it disclosed the Merger Agreement.  Collectively, the press release announcing the Proposed Transaction and the filing of the Merger Agreement reveal that the Proposed Transaction is the product of a flawed sales process and, unless the Merger Consideration is increased, would be consummated at an unfair price.

103.  The Company's standalone prospects far exceed the value offered in the Proposed Transaction.  The Merger Consideration represents a scant 11.5% premium to the closing price for the Company's shares on the day prior to the announcement.

104.  In the aftermath of the announcement, analyst Joshua J. Elving of Feltl criticized the Proposed Transaction.  In his January 30, 2017 report, Mr. Elving stated that the deal price is "too low."  Mr. Elving explained that "adjusted EPS could grow more than 30% over the next two years, which would potentially value this transaction at around 10x 2018 adjusted EPS."  Mr. Elving also reiterated his belief that the target price would have increased to "around $15 a share, which makes this transaction price appear low for current shareholders."

105.    In short, the value of MoneyGram on a standalone basis is currently higher than the value offered by the Merger Consideration.

### THE MERGER AGREEMENT UNFAIRLY DETERS COMPETITIVE OFFERS AND IS UNDULY BENEFICIAL TO ANT FINANCIAL AND THE ANT AFFILIATES

106.    The Proposed Transaction is also unfair because, as part of the Merger Agreement, Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction *a fait accompli* and ensure that no competing offers will emerge for the Company.

107.    The Merger Agreement contains a No-Solicitation clause in which the Company must immediately cease and terminate any existing solicitation.  In fact, Section 5.4(a) of the Merger Agreement forces the Company to cease any communications already occurring, stating:

> The Company will, and will cause its Subsidiaries and its and its Subsidiaries' directors, officers, employees and Representatives to, immediately cease and cause to be terminated any discussions or negotiations conducted with any persons other than Parent with respect to any Company Acquisition Proposal, including immediately revoking or withdrawing access of any person other than Parent and its directors, officers, employees and Representatives to any data room (virtual or actual) containing any non-public information with respect to the Company or its Subsidiaries previously furnished with respect to a Company Acquisition Proposal.

108.    Section 5.4(a) further expressly prohibits the Company from soliciting any Acquisition Proposals, stating:

> the Company shall not, and the Company shall cause its Subsidiaries not to, and shall use reasonable best efforts to cause its and its Subsidiaries' respective directors, officers, employees and Representatives not to, directly or indirectly, (i) initiate, solicit, knowingly encourage or knowingly facilitate (including by way of providing information) the submission of any inquiries, proposals or offers that constitute or would reasonably be expected to lead to any Company Acquisition Proposal, (ii) have any discussions or negotiations with or provide any confidential information or data to any person relating to a Company Acquisition

Proposal, or engage in any negotiations concerning a Company Acquisition
Proposal…

109.     Furthermore, Section 5.4(c) grants Alipay UK, and thereby Ant Financial,
recurring information rights and provides MoneyGram forty-eight (48) hours to provide
unfettered access to confidential, non-public information about competing proposals from third
parties, plus an additional forty-eight (48) hours following a material amendment to the terms.

110.     In addition, § 5.4(d) of the Merger Agreement demands that should the Board
determine to enter into a superior competing proposal, it must grant Alipay UK and thereby Ant
Financial four (4) business days, plus an additional two (2) business days following a material
amendment to the terms and conditions of a superior offer, in which the Company must negotiate
in good faith with Alipay UK and thereby Ant Financial in its efforts to make a counter-offer so
that the superior offer is no longer superior.  In other words, the Merger Agreement gives Alipay
UK and Ant Financial access to any rival bidder's information and a free right to top any
superior offer simply by matching it.  Accordingly, no rival bidder is likely to emerge and act as
a stalking horse, because the Merger Agreement unfairly assures that any "auction" will favor
buyer, which can piggy-back on the due diligence of the foreclosed second bidder.

111.     Further, § 5.4(a) includes a "change of recommendation" provision which restricts
the Company and board of directors from changing, qualifying, withholding, withdrawing or
modifying, or publicly proposing to do any of the aforementioned, the Recommendation.

112.     Compounding matters, Section 7.2(b)(ii) of the Merger Agreement requires the
Company to pay a termination fee to Alipay UK in the event the Company decides to pursue any
alternative offer.  By the terms of the Merger Agreement, this termination fee will be payable to
Alipay UK in the amount of $30 million.  As such, this termination fee would require any

40

competing bidder to agree to pay a naked premium simply for the right to provide MoneyGram's shareholders a superior offer.

113.     Moreover, in connection with the Proposed Transaction, Alipay UK and thereby Ant Financial has entered into a voting agreement with THL and certain directors and executive officers of the Company in their capacity as stockholders of the Company.  According to the Proxy, the shareholders that executed the voting and support agreement collectively own approximately 45% of MoneyGram's outstanding shares, which under the terms of the voting agreements will be voted in favor of the Proposed Transaction.

114.     Finally, the Merger Agreement further contains a "no-waiver" provision, which requires the Board to enforce any existing confidentiality or standstill agreements and may be preventing any potentially competing bids from coming forward.

115.     Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The narrow circumstances under which the Board may respond to a proposal for an alternative transaction that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

## THE FALSE AND MISLEADING PROXY STATEMENT

116.     Stockholders must receive complete and accurate information about the Proposed Transaction prior to deciding whether to vote in favor of the Proposed Transaction. The Individual Defendants have a duty under Sections 14(a) and 20(a) of the Exchange Act to disclose all material information regarding the Proposed Transaction to MoneyGram

stockholders so that they can make a fully informed decision whether to vote in favor of the Proposed Transaction or seek to exercise their appraisal rights.

117.    To date, however, the Individual Defendants have failed to provide MoneyGram stockholders with such information, in violation of Sections 14(a) and 20(a) of the Exchange Act. As set forth in more detail below, the Proxy omits and/or misrepresents material information concerning, among other things:  (1) MoneyGram's financial projections; (2) the data and inputs underlying the financial valuation exercises that purportedly support the so-called "fairness opinion" provided by Barclays; (3) the data and inputs underlying the financial valuation exercises of BofA Merrill Lynch, MoneyGram's financial advisor; and (4) the background of the Proposed Transaction.

### (a)    Management's Projections

118.    The Proxy discloses that BofA Merrill Lynch expressly relied on MoneyGram management's projections (the "Management Projections") in assessing the fairness of the Proposed Transaction to MoneyGram stockholders and rendering their respective fairness opinions. However, the Management Projections are missing the following information: (1) unlevered after-tax free cash flows; (2) reconciliation of UATFCF to net income; (3) adjusted earnings per share; (4) stock-based compensation; and (5) cash amounts spent on signing bonuses

119.    Because BofA Merrill Lynch relied on these projections in performing their financial analyses and rendering their fairness opinions, the omission of this information renders the entire fairness opinion of each financial advisor in the Proxy false and/or materially misleading.

120.    These statements in the Proxy are rendered false and/or misleading by the omissions identified above as this information is integral to stockholders' evaluation of the consideration being offered in the Proposed Transaction.   These financial projections provide a sneak peek into MoneyGram's expected future performance (i.e., growth/profitability) and, consequently, its value as a standalone entity.    More importantly, however, this expected performance is more reliable than similar forecasts prepared by third-party analysts and other non-insiders, as it comes from members of corporate management who have their fingers on the pulse of the Company.   Accordingly, it is no surprise that financial projections are among the most highly sought-after disclosures by stockholders in the context of corporate transactions such as this.

### (b)    BofA Merrill Lynch's Financial Analyses

121.    The Proxy also fails to fully and fairly disclose certain material information concerning the financial analyses conducted by BofA Merrill Lynch that purport to support its fairness opinion.

122.    For example, with respect to BofA Merrill Lynch's *Discounted Cash Flow Analysis*, the Proxy fails to define what "unlevered, after-tax free cash flows" means, to identify the variables used to calculate it, to quantify the variables, and to provide the basis for each. BofA Merrill Lynch also does not provide terminal pricing multiples implied by the assumed perpetuity growth rates in the analysis.   The assumptions used to calculate the weighted average cost of capital are not disclosed.    Additionally, BofA Merrill Lynch fails to quantify the assumptions and provide the basis for each.

123.    With respect to Other Factors, BofA Merrill Lynch does not disclose the range of undiscounted price targets and fails to identify the assumptions used in calculating the cost of equity, to quantify the assumptions and provide the basis for each.

124.    These statements in the Proxy are rendered false and/or misleading by the omissions identified above because such omissions are essential to the stockholders' ability to properly evaluate the analysis performed by BofA Merrill Lynch.  Without the aforementioned information, stockholders ability to understand MoneyGram's analysis is significantly limited, rendering them unable to make a fully-informed decision whether to vote to approve the Proposed Transaction.

### (c)    THL's and Goldman's Role in the Process

125.    The Proxy states that THL owns approximately 44.0% of the Company's outstanding Common Stock and,

> by entering into a voting and support agreement, has agreed to vote all of its shares of Common Stock that it owns in favor of the approval and adoption of the merger agreement." However, in the event our board of directors changes its recommendation with respect to the merger (other than in connection with a third party acquisition proposal) in accordance with the terms of the merger agreement, the number of each stockholder's shares of Common Stock subject to the voting and support agreement shall be reduced, pro rata, such that the aggregate amount of Common Stock subject to all of the voting and support agreements, taken together, equals 35% of the outstanding Common Stock of MoneyGram as of the record date for the special meeting called to approve and adopt the merger agreement. See the section entitled "The Voting and Support Agreements." If the merger is consummated, THL would receive $314,526,618.50 in merger consideration for its 23,737,858 shares of Common Stock.

126.    The Proxy further states the following with respect to Goldman's interest in the Company:

> In connection with the execution of the merger agreement, Goldman Sachs, as the holder of all of the Series D Preferred Stock

> delivered an irrevocable written consent to Alipay to the merger
> and the treatment of the Series D Preferred Stock in the merger
> agreement. Goldman Sachs owns 71,281.9038 shares, or 100%, of
> Series D Preferred Stock, which are convertible in 8,910,234
> shares of Common Stock. Upon completion of the merger, Goldman
> Sachs would receive $118,060,600.50 in merger
> consideration for its 71,281.9038 shares of Series D Preferred
> Stock.

127.     The Proxy, however, does not contain any information concerning THL's

relationship with Party C and Party E or why each independently contacted THL representatives

on the Company's Board prior to contacting the Company itself.

128.     The Proxy stated that on January 5, 2017, representatives of BofA Merrill Lynch

finally disclosed its "material relationships" with nearly every party involved in the process:

> BofA Merrill Lynch furnished information to our board of
> directors with respect to BofA Merrill Lynch's material
> relationships with each of THL and Goldman Sachs (and certain of
> their respective affiliates and portfolio companies), as well as with
> Ant Financial, Alibaba Group Holding Limited (an entity with
> long-term commercial agreements with Ant Financial), Party D
> and Party E, including (but not limited to) the fact that BofA
> Merrill Lynch derived a significant amount of revenues from each
> of THL and Goldman Sachs and their respective affiliates and
> portfolio companies, that BofA Merrill Lynch (including members
> of the deal team working with MoneyGram) would continue to
> meet with and provide services to THL, Goldman Sachs, their
> respective affiliates and portfolio companies, as well as Party D
> and Party E, and further, that BofA Merrill Lynch (excluding
> members of the deal team working with MoneyGram) regularly
> provides advice to Party D with respect to strategic alternatives,
> some of which could be mutually exclusive to an acquisition of
> MoneyGram by Party D. However, BofA Merrill Lynch advised
> MoneyGram that it was not advising Party D with respect to its
> discussions with MoneyGram; Party D was represented by another
> investment bank in connection with such discussions. Our board of
> directors then discussed the relationships disclosed by BofA
> Merrill Lynch, and determined that they did not adversely affect
> BofA Merrill Lynch's independence or ability to act as financial
> advisor to MoneyGram. Our board of directors then determined to
> enter into a written engagement agreement with BofA Merrill
> Lynch as its financial advisor, on the terms disclosed in more detail

under "The Merger—Opinion of MoneyGram's Financial Advisor
Regarding the Merger Consideration."

129.    The Proxy, however, does not disclose the nature of the relationships, the amount
of remuneration received by BofA Merrill Lynch from each of these parties, and whether the
Board considered engaging a truly independent banker to render an additional fairness opinion.
The Proxy further fails to disclose why BofA Merrill Lynch only made these material disclosures
to the Board many months after the process was underway and the Board, through its
representatives (BofA Merrill Lynch) and its members, had been negotiating with counterparties
that were subject to "material relationships" with BofA Merrill Lynch.

130.    The Proxy further fails to disclose material information concerning Goldman's
role.  Specifically, the Proxy states that during a December 7, 2017 Board meeting, "Ms. Patsley
also advised our board of directors that representatives from Goldman Sachs had requested that
Goldman Sachs, in its capacity as one of the two largest stockholders of MoneyGram be
provided with non-public information with respect to any potential strategic transaction, and that
Ms. Patsley would recommend sharing such information with Goldman Sachs so long as they
entered into an appropriate confidentiality agreement."

131.    The Proxy does not state whether Goldman Sachs executed a confidentiality
agreement or was afforded access to a broader array of information than that shared with the
potential bidders.

132.    Finally, given that the Company purchased 8.2 million shares from THL at $16.25
per share, the Proxy must disclose what role THL played in the Company's decision to seek a
buyer at this time.

(d)    **Disclosure Concerning the Deferred Prosecution Agreement**

133.    The Proxy states the following concerning the Deferred Prosecution Agreement:

>Since November 9, 2012, the Company and its Subsidiaries has
>undertaken, and will continue to undertake, the enhanced
>compliance obligations described in Attachment C to the Deferred
>Prosecution Agreement, by and among the Company, the U.S.
>Attorney's Office for the Middle District of Pennsylvania and the
>U.S. Department of Justice (the "Deferred Prosecution
>Agreement") and neither the Company nor its Subsidiaries is in
>breach or violation of, and has not received any notice regarding a
>breach of the Deferred Prosecution Agreement by the Company, its
>Subsidiaries or any of their respective Representatives. The
>Company has made available to Parent true, correct and complete
>copies of the Deferred Prosecution Agreement, each report
>prepared by the Company's monitor appointed under the Deferred
>Prosecution Agreement (and written responses, if any, by the
>Company to such reports) and all material written communications
>from and to the U.S. Department of Justice in connection with the
>Deferred Prosecution Agreement.

134.    The Proxy, however, does not detail whether the DPA and monitor will be

released in November 2017 and the associated cost savings.  It further fails to explicate whether

other counterparties to the process requested information relating to the DPA and if they were

afforded the same access.

### (e)    Sales Process Leading to the Proposed Transaction

135.    Finally, the Proxy fails to fully and fairly disclose certain material information

concerning the process leading to the Proposed Transaction.  With respect to the sales process

that led to the Proposed Transaction, Plaintiff incorporates by reference the allegations contained

herein.

136.    The Proxy is false and/or misleading due to the omissions identified in above

because it does not give stockholders material information that will allow them to fairly assess

the process undertaken by the Board leading up to the Proposed Transaction.

137.    Defendants' failure to provide MoneyGram stockholders with the foregoing

material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act, and

Rule 14a-9 promulgated thereunder.  The Individual Defendants were aware of their duty to

disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy.  Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to vote in favor of the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

138.    Plaintiff and the other members of the Class are immediately threatened by the wrongs complained of herein, and lack an adequate remedy at law. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I

**For Violations of Section 14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder
(Against the Individual Defendants and MoneyGram)**

139.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140.    SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

141.    During the relevant period, the Individual Defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder. MoneyGram is liable as the issuer of these statements.

142.    By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxy.  The Proxy was prepared, reviewed, and/or disseminated by the Individual Defendants.   The Proxy misrepresented and/or omitted material facts, including material information about the unfair sale process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's assets.  The defendants were at least negligent in filing the Proxy with these materially false and misleading statements.  The defendants have also failed to correct the Proxy and the failure to update and correct false statements is also a violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

143.    The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction.   In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

144.    By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

145.   Unless the Individual Defendants are enjoined by the Court, they will continue to breach their duties owed to Plaintiff and the members of the Class, to the irreparable harm of the members of the Class.

146.   Because of the false and misleading statements in the Proxy, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate.   Therefore, injunctive relief is appropriate to ensure the Individual Defendants' misconduct is corrected.

### COUNT II
### For Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants, Ant Financial and Ant Affiliates)

147.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

148.   The Individual Defendants acted as controlling persons of MoneyGram within the meaning of Section 20(a) of the Exchange Act as alleged herein.   By virtue of their positions as officers and/or directors of MoneyGram and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

149.   Each of the Individual Defendants, Ant Financial and Ant Affiliates were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

150.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, each of the Individual

Defendants is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

151. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that they reviewed and considered — descriptions that had input from the Individual Defendants.

152. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants jointly and severally, as follows:

(A) Declaring that this action is properly maintainable as a class action and certifying Plaintiff as the Class representatives and its counsel as Class counsel;

(B) Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them from proceeding with, consummating, or closing the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain an agreement providing fair and reasonable terms and consideration to Plaintiff and the Class;

(C) Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

(D)     Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants' wrongdoing;

(E)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

(F)     Granting such other and further equitable relief as this Court may deem just and proper.

Dated:  March 13, 2017                          **FARUQI & FARUQI, LLP**

                                               By: */s/ James R. Banko*
                                               James R. Banko (#4518)
                                               Michael Van Gorder (#6214)
                                               20 Montchanin Road, Suite 145
                                               Wilmington, DE 19807
                                               Tel.: (302) 482-3182
                                               Fax: (302) 482-3612
                                               Email: jbanko@faruqilaw.com
                                               Email: mvangorder@faruqilaw.com

                                               *Counsel for Plaintiff*

**WOLF HALDENSTEIN, LLP**
Gregory M. Nespole
270 Madison Avenue
New York, NY 10016
(212) 545-4600
Email: GMN@WHAFH.com

*Counsel for Plaintiff*